## BUHLER v. UNITED STATES.

Circuit Court of Appeals, Ninth Circuit.
July 1, 1929.

No. 5783.

Bronson, Bronson & Slaven and Harold R. McKinnon, all of San Francisco, Cal., for appellant.

George J. Hatfield, U. S. Atty., and George M. Naus, Asst. U. S. Atty., both of San Francisco, Cal.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge. With others, appellant was adjudged guilty upon an indictment charging him, in the first 14 counts, with use of the mails in furtherance of a scheme to defraud, under section 215 of the Penal Code (18 USCA § 338), and in the fifteenth count with a conspiracy covering the same general transactions, under section 37 (18 USCA § 88). He and four of his co-defendants were convicted on all counts, and there was a single judgment imposing a punishment less than what might have been inflicted under any one of the first 14 counts, but in excess of the maximum for conspiracy.

As has been observed, where two or more persons use the postal facilities in the execution of a scheme to defraud, set on foot by them, charges based thereon under these two sections generally involve substantially the same essential elements, and what is competent evidence to support one would be equally competent to support the other. Our decision in Robinson et al. v. United States (No. 5665) 33 F.(2d) 238, filed June 17, 1929. The scheme or enterprise covered by the charges had to do with the prospecting, exploration, and location of public lands supposed to contain deposits of potash in the Great Salt Lake desert, under the provisions of the Act of October 2, 1917 (40 Stat. 297 (30 USCA §§ 141–152), and regulations promulgated thereunder. It seems that in order of time three different groups were organized, each with the purpose of securing permits, prospecting, and ultimately locating claims and securing patents therefor. In the record the first is referred to as the Potter group, the second as the chloride products or doctors' group, and the third, the group (without particular designation in the record) to which the charges more directly relate. As alleged, the plan was, by false representations touching conditions, values, and prospective profits, to induce members of the public, referred to as "victims," to join in the enterprise and advance funds to make locations and otherwise carry on the work of developing claims and procuring title thereto.

But two contentions are urged upon our consideration: (1) That the court erred in receiving testimony touching appellant's connection with the so-called doctors' group; and (2) that as to him the prosecution was barred by the statute of limitations.

In the indictment it is charged that, for the purpose of defrauding "victims," defendants planned falsely to represent to them that the doctors' group was making large profits from operations in the same general territory and was paying large dividends. By the government, Dr. Cloud, the secretary and treasurer of this group, was called as a witness, and after he stated that it was through appellant he had become interested, and that he had paid him $400, this incident occurred: "Q. Did he give you an agreement of some kind? A. Yes. Mr. Christensen (attorney for appellant): We object. It is not within the indictment." Without comment, the objection was overruled and exception was taken. The direct examination con-

tinued at some length, the agreement referred to was thereupon offered and received in evidence, and there was considerable cross-examination. At no time was any further objection of any kind offered, nor was any motion to strike out made or any other exception taken.

Under the indictment clearly evidence within a certain range relating to the doctors' group transactions was directly relevant to the charges. It may be that the field actually covered was too extensive, but the court was not advised by the objection interposed, which was to a question of a purely preliminary character, where to draw the line. Specific objections should have been made as the examination proceeded, to enable the court to rule intelligently. Neither side now contends that the agreement referred to had any substantial probative value, nor could it be contended that its admission could have in anywise influenced the jury. The testimony which is now urged as prejudicial was elicited later, when defendant interposed no objection, made no motion to strike, and took no exception. Clearly we think the assignment is without substantial merit.

 The period of limitations for the prosecution of such offenses is three years. Rev. St. U. S. § 1044, 18 USCA § 582. The indictment was filed March 26, 1928. The rule of continuing responsibility on the part of one who has joined in a criminal scheme is with some particularity explained in Hyde v. United States, 225 U. S. 347, 368, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614. After referring to the contention of the defendants in that case that the statute begins to run from the last "conscious participation" of a conspirator, and the contention of the government that a distinction is to be drawn between a specific, accomplished conspiracy and one having continuity of purpose, contemplating the performance of acts through a series of years, the court said:

"The conspiracy accomplished or having a distinct period of accomplishment is different from one that is to be continuous. If it may continue it would seem necessarily to follow the relation of the conspirators to it must continue, being to it during its life as it was to it the moment it was brought into life. If each conspirator was the agent of the others at the latter time he remains an agent during all of the former time. This view does not, as it is contended, take the defense of the statute of limitations from conspiracies. It allows it to all, but makes its application different. Nor does it take from a conspirator the power to withdraw from the execution of the offense or to avert a continuing criminality. It requires affirmative action, but certainly that is no hardship. Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law. As the offense has not been terminated or accomplished he is still offending. And we think, consciously offending, offending as certainly, as we have said, as at the first moment of his confederation, and consciously through every moment of its existence. The successive overt acts are but steps toward its accomplishment, not necessarily its accomplishment. This is the reasoning of the Kissel Case [218 U. S. 601, 31 S. Ct. 124, 54 L. Ed. 1168] stated in another way. As he has started evil forces he must withdraw his support from them or incur the guilt of their continuance. Until he does withdraw there is conscious offending and the principle of the cases cited by defendants is satisfied."

One of the cases so referred to was Ware v. United States (C. C. A.) 154 F. 577, 12 L. R. A. (N. S.) 1053, 12 Ann. Cas. 233. The court did not attempt to lay down any specific rule defining what would be a sufficient act of withdrawal or what would be competent or sufficient evidence to establish it. The formation of a criminal conspiracy or adherence to a criminal scheme may be shown by evidence either direct or circumstantial, in practice often taking a wide range, and we see no reason why the withdrawal should not be held susceptible to proof of the same character. It might, of course, be shown by a writing, or by an express oral agreement, and we think by conduct wholly inconsistent with the theory of continuing adherence. But the mere failure to perform an overt act in furtherance of the conspiracy, or mere inactivity not inconsistent with the theory of continuing adherence, would not of itself necessarily import withdrawal.

The government does not contend that appellant devised or participated in devising the scheme in question, or in its inception had anything to do with or knew anything about it. He had at an earlier date invested in and become a stockholder in the doctors' group through the agency of one or two of the originators and promotors of the project covered by the indictment. Subsequently, meeting him casually in connection with a trip he was contemplating from Los Angeles to San Francisco, they persuaded him to stop over at Watsonville and give them assistance

in effecting sales of interests in this latter group. This was in October or November, 1924, and from that time forward to the middle of the following February he visited Watsonville a few times, and while there gave assistance to one or more of the persons so engaged in selling interests, by accompanying them and making representations to "prospects" touching the status and profits of the enterprise carried on by the doctors' group. He testified that he never had any interest in the indictment project, and there is no evidence to the contrary. Nor is there any evidence of any agreement that he was to receive a salary or commissions, or indeed would be entitled to any compensation, and the record gives the impression that at the outset at least he expected none.

The only testimony we have found upon the subject is that of the appellant himself, who said that altogether he was paid $140, and that of one of the promoters of the project, who said: "I paid Buhler but a few dollars; just contributed to his expense. I did not feel like having him go around to see some of our friends and tell them about the chloride products group [the doctors' group] without giving him some money to go towards his expense." There is no evidence of any agreement or understanding that he was to do anything other or more than what he actually did at Watsonville, or that he was to have any interest or further participation, or that at any time he used the mails. He left Watsonville on February 14, 1925, so he testified, and there is no evidence to the contrary, which was 44 days more than 3 years prior to the finding of the indictment. The record exhibits later transactions, within the 3-year period, of other defendants in furtherance of their scheme, but, in so far as appears, appellant received no money and performed no act after February 14th, and he himself positively testified that thenceforth he had no connection with the project, or with any of the defendants in respect thereof.

It is, of course, to be conceded that, if one knowing of a conspiracy, or of a scheme to defraud, gives aid or assistance in consummating its purpose, he thereby becomes a participant and is criminally chargeable; and with that principle in mind counsel for the government argue that by his assistance at Watsonville appellant became a "partner in crime" with the other defendants, and that the statute of limitations would not begin to run until there was a dissolution of such partnership, and appellant "communicated by act or word" to his associates his decision to withdraw. 2 Starkie on Evidence (2d Ed.) 26; Wilson v. United States, 5 Ind. T. 610, 82 S. W. 924, 927; People v. Chapman, 224 N. Y. 463, 121 N. E. 381, 385; State v. Klein, 97 Conn. 321, 116 A. 596, 597; Miller v. United States (C. C. A.) 277 F. 721, 725; Boyle v. United States (C. C. A.) 259 F. 803, 807; Sunderland v. United States (C. C. A.) 19 F.(2d) 202, 217.

Accepting that as a correct statement of the rule, we have difficulty in perceiving in what respect appellant failed to bring himself within it. As has been pointed out, there never was any agreement of general or continued participation in the scheme. Such "partnership" as arose from the casual assistance he gave, as apparently all parties understood, was to be limited and temporary. So far as appears, no one expected any further participation, assistance, or any further interest on his part, and upon the record it would seem clear that when he left Watsonville the other defendants understood that such relations as had existed were at an end. In short, the "dissolution" was in accordance with the understanding had from the beginning. Unless an express declaration in words is indispensable—and this the government does not assert—we hardly see what more could have been done to effect a "dissolution of the partnership," or to more fully advise the other parties of appellant's withdrawal.

Upon the whole, we are constrained to the view that a verdict, implicit in which is a finding beyond reasonable doubt that appellant continued to participate in the alleged conspiracy or scheme to defraud after March 25, 1923, was unwarranted.

The judgment will therefore be reversed, with directions to grant a new trial.