**UNITED STATES of America, Plaintiff,**

v.

**John C. GREICHUNOS and John Coulopoulos, a/k/a John Coules, Defendants.**

**Nos. 82 CR 339–1, 82 CR 339–3.**

United States District Court, N.D. Illinois, E.D.

Oct. 11, 1983.

Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff.

Edward Genson, Jeffrey B. Steinback, Chicago, Ill., for defendant Greichunos.

John Kappos, Merrillville, Ind., for defendant Coulopoulos.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

A two count indictment was returned on May 13, 1982. Count 1 charged John Greichunos ("Greichunos"), John Coulopoulos, also known as John Coules ("Coules"), and Christ Christopoulos ("Christopoulos") with conspiring to enter the First National Bank of Skokie, Illinois ("bank") with intent to commit larceny. Count 2 charged Greichunos with burglary of the bank on May 15, 1977, aided and abetted by others. Christopoulos pleaded guilty to count 1 and testified for the government at the trial of Greichunos and Coules, who were convicted by a jury on count 1. We entered a judgment of acquittal on count 2 at the close of the government's case because the evidence failed to prove that Greichunos, to the exclusion of others, burglarized the bank on May 15, 1977. R. 386–87.

The government's case was based primarily on the testimony of Christopoulos, who told the following bizarre story.

Christopoulos ran a business which provided after-hours security services for the bank. In late 1976, in middle age, he underwent a severe depression stemming in part from marital difficulties which had included an extramarital affair with a teenage girl, whom he ultimately married. He concocted a scheme that he believed would redeem him in the eyes of his family and in his own conscience and would permit him to make amends to his family. In October 1976, Christopoulos purchased a life insurance policy with a face amount of $135,000 and named his wife and children as beneficiaries. He planned to recruit someone to burglarize the bank and kill him (Christopoulos) during the burglary, making it appear that he died in the line of duty while attempting to thwart the burglary.

Owing to a long association with the bank, Christopoulos was a trusted servant. He was provided with the second half of the combination to the vault used at the drive-in window, which had a separate vault because it opened earlier and closed later than the rest of the bank. Part of Christopoulos' job was to oversee the opening of the drive-in window in the morning; he was given the second half of the combination in case the employee who normally assisted with that part of the combination could not be present on a given morning. Christopoulos had surreptitiously obtained the first half of the combination from a notebook kept by Daniel Casey, a bank vice president. He also had the keys to the doors to the bank and the drive-in area, as well as to the alarm system connected with the drive-in tellers' safe.

According to Christopoulos, in December 1976 he went to his friend Coules, who owned a junkyard, to recruit him into the scheme. He described the plan to Coules and gave him the combination to the safe in order to prove his sincerity. Coules listened, took the combination, and said that he would think about the scheme. Two or three weeks later, Christopoulos testified, Coules called him at home to set up another meeting. A few days thereafter, the two met at a Chicago restaurant, and Coules told Christopoulos that he wanted to introduce Christopoulos to another man who would also participate in the scheme. Seven to ten days later, a meeting took place in Christopoulos' apartment; Christopoulos, Coules, and "another gentleman that [Coules] brought by the name of John" were present. R. 122. At trial, Christopoulos identified defendant Greichunos as "John." The plan was discussed, and Christopoulos gave Coules a key to the alarm. The three discussed how to "disguise" the burglary so that the police could not tell that it was an "inside job." Greichunos suggested that a lock pick be planted on the premises after the burglary and that the burglar(s) take the safe door with them, to eliminate all evidence relating to the means of entry.

Another meeting was arranged, and three or four days later Christopoulos and Greichunos met at a restaurant on the far north side of Chicago. At this meeting, Greichunos told Christopoulos that Coules was reluctant to go through with the plan to kill Christopoulos as part of the scheme. Christopoulos responded that he "hop[ed] the thing would go down the way it was supposed to." R. 126.

The final meeting among the three conspirators began outside another Chicago restaurant. Although Christopoulos' recollection of the date of this meeting changed during the trial, it occurred, at the latest, one week before May 15, 1977, and perhaps as early as two and one-half weeks before that date. See R. 126, 191, 213–14, 217, 218. The three drove to the bank to perform a "dry run" of the burglary. Upon arriving, they entered the bank, turned off the alarm, and opened the vault. They discovered that some of the money was contained in a small locked storage compartment inside the vault, and they decided to "jimmy" that lock at the time of the actual burglary. According to Christopoulos, after completing the dry run, either Coules or Greichunos told Christopoulos that he would be called when a date was set so that he could be there "so [he] could get shot." R. 131.

Christopoulos had no further conversation, meetings or contact with either Coules or Greichunos after the dry run. Indeed, he thought that they had decided against carrying out the scheme. See R. 131, 265–66, 268. However, the bank was burglarized on May 15, 1977. Christopoulos discovered the burglary while making his morning rounds and called the police. The modus operandi of the burglars conformed to Christopoulos' version of the alleged plan.

Approximately one and one-half months later, Christopoulos visited Coules at his junkyard. Christopoulos accused Coules of double crossing him by going through with the burglary behind his back, and he demanded a one-third share of the $118,000 which had been stolen from the bank. Coules responded that he "didn't have any of the money," that he "didn't know anything about it," and that Christopoulos was not right in insisting that Coules give him money. R. 136. Christopoulos did not give up, however, and he visited Coules again about one month later. This time, Christopoulos testified, Coules said that he "figured that he did owe [Christopoulos] some money." R. 136. He gave Christopoulos $1,000.[1] Several months later, Christopoulos made yet another visit to Coules' junkyard, accompanied by his new teenage wife, Caroline Phillips. He again accused Coules of double crossing him. He testified that Coules agreed to pay him $5,000; however, Coules never kept that promise.[2]

Two and one-half years later in early 1980, while residing in Arizona, Christopoulos decided to purge himself of guilt. He confessed his misdeeds to the FBI. In May 1980, he visited Coules again, this time wired for sound. In response to Christopoulos' continued accusation of a double cross, Coules accused Christopoulos of dealing with "John" and denied having participated in the burglary. Pressed by Christopoulos for the identity of "John", Coules stated he was a man named Vincent Rolarelli. See Government Exhibit ("G.Ex.") T–1, TR–1. Christopoulos later identified Greichunos from a photo spread as the man whom he had known only as "John." R. 146.

Caroline Phillips testified for the government that she was present at one of the post-burglary meetings between Christopoulos and Coules. She stated that during the meeting, Christopoulos gave Coules a diagram of the bank, and that Coules burned it, saying, "Well, now, all the proof is gone." R. 345.

In their post trial motions, defendants urge that their prosecution for the alleged conspiracy was barred by the statute of

---

1. On cross examination, Christopoulos testified that Coules had told him that he was giving him the money because he felt sorry for him. R. 250.

2. The testimony relating to Christopoulos' meetings with Coules after the burglary was admitted into evidence only as to Coules. See Fed.R.Evid. 801(d)(2)(E).

limitations in that the government failed to prove beyond a reasonable doubt that an overt act in furtherance of the conspiracy was committed within five years of the return of the indictment on May 13, 1982. Alternatively they argue that the jury was not properly instructed on the statute of limitations issue. In addition, they assert that they are entitled to a new trial due to the government's failure to produce in a timely fashion exculpatory evidence as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant Greichunos argues that the photo spread from which Christopoulos identified him was impermissibly suggestive and that the photo identification and Christopoulos' in-court identification of him were thereby tainted. Defendants also argue that the government's eliciting of testimony from Christopoulos that he has been accepted into the government's witness protection program was highly prejudicial. The facts relevant to these arguments, as well as the others raised in defendants' motions, are contained in the body of this opinion.

#### A

■ Defendants argue first that the indictment and prosecution for conspiracy are barred by the statute of limitations. Defendants were charged under the general conspiracy statute, 18 U.S.C. § 371 (1976). A person may not be prosecuted under § 371 unless the indictment is returned within five years of the commission of the offense. 18 U.S.C. § 3282 (1976). Defendants argue that the indictment fails to allege any overt acts in furtherance of the conspiracy within the five year period ending May 13, 1982, the date on which the indictment was returned, and that no such overt acts were proved beyond a reasonable doubt at trial. Defendants also complain of our refusal to give the jury instruction they tendered on this issue.

The government responds that it need not allege any overt acts within the limitations period and may rely upon unalleged acts to meet its burden of proof. As to defendants' contention concerning proof at

trial, the government responds that the jury reasonably could have found "that the agreement continued into the limitations period and that an overt act—the burglary itself—was committed in furtherance of the agreement within the statutory period." Government's Consolidated Response to Defendants' Post Trial Motions at 3–4.

■ It is clear in this circuit that the government may rely upon overt acts not alleged in the indictment to prove that a criminal conspiracy continued into the limitations period. *United States v. Read,* 658 F.2d 1225, 1239 (7th Cir.1981); *United States v. Harris,* 542 F.2d 1283, 1300 (7th Cir.1976). Thus, our earlier denial of defendants' motion to dismiss the indictment on these grounds was proper, and the motion in arrest of judgment renewing the earlier motion to dismiss is denied.

■ The government's position on the second prong of defendants' argument has two aspects. First, it has argued throughout the course of this case that the burglary was an act in furtherance of the conspiracy. *See* Government's Consolidated Response to Defendants' Pretrial Motions at 1–2 (filed Aug. 13, 1982); Government's Consolidated Response to Defendants' Post Trial Motions at 4–5. *See also* R. 383 (argument on defendants' motion for judgment of acquittal). Second, it takes the position that unless defendants produced evidence that they withdrew from the conspiracy prior to May 13, 1977 (five years prior to the return of the indictment) or that the object of the conspiracy was defeated or achieved before that date, the government was not required to prove beyond a reasonable doubt that an overt act in furtherance of the conspiracy occurred within the limitations period. *See* Government's Consolidated Response to Defendants' Pretrial Motions at 1–2. The government argued in its response to the motion to dismiss the indictment that "[o]nce established, a partnership in crime continues until fruition or until some act is taken to disavow it or to defeat its purpose." *Id.* at 2. During the trial, in its argument on defendants' motion for a judgment of acquittal at the close of the govern-

ment's case, the government argued "that the conspiracy continued because there was no withdrawal by any of the parties based on the Government's evidence." R. 383. The government reaffirms this contention in its response to the post trial motions: "[d]efendants presented no evidence that they abandoned or terminated the conspiracy after the 'dry run' with Christopoulos in early May, 1977 ...." Government's Consolidated Response to Defendants' Post Trial Motions at 4.

Defendants tendered the following instruction on the statute of limitations issue:

If you find that the government has failed to prove beyond a reasonable doubt that the May 15, 1977 larceny of the First National Bank of Skokie was a result of the conspiracy alleged in count one, or an offshoot thereof, committed by defendant Greichunos or defendant Coules, then you must find the defendant [sic] not guilty.

Defendants' Instruction No. 11; see R. 505, 506. We expressed confusion with the "offshoot" language contained in the proposed instruction, and, in response, defendant Greichunos' attorney offered to strike that language. R. 508. Nevertheless, we refused the instruction, relying upon the government's argument that it did not represent a correct statement of the law. The instruction given on the statute of limitations issue was as follows:

If the government has failed to prove beyond a reasonable doubt that the May 15, 1977 burglary of the First National Bank of Skokie was not [sic] a result of the conspiracy which is charged in the indictment, then you may not consider the burglary as an overt act committed pursuant to the alleged conspiracy.

If you find that the conspiracy as alleged in count one, which is the only count before you—if you find that this conspiracy terminated prior to May 13, 1977, then you must find both defendants not guilty.

This indictment was returned, ladies and gentlemen, on May 13, 1982. And the law provides that criminal prosecu-

tions must be commenced within five years of the commission of the offense.

So if this conspiracy as alleged by the government—if you should find beyond a reasonable doubt that it existed at some point, but then that it terminated prior to May 13, 1977, then you must find both defendants not guilty.

See R. 592–93. Although we charged the jury that one element of the crime of conspiracy was the commission of an overt act in furtherance of the conspiracy, R. 590, at no time did we instruct the jury, as defendants requested, that the government must also prove beyond a reasonable doubt that an overt act in furtherance of the conspiracy took place within the limitations period. While it is clear that if the burglary was in furtherance of the conspiracy, the statute of limitations would be satisfied (assuming that there was sufficient evidence to submit count one to the jury on that theory), our instruction did not require the jury to make that finding. Rather, it stated that if the jury did not find that the burglary was in furtherance of the conspiracy, it was not an "overt act" within the statute.

The government's response to this is that it need not prove an overt act within the limitations period, that the jury was not required to find that the burglary was in furtherance of the conspiracy and thus that our refusal of defendants' instruction was proper. In essence, it claims that defendants must offer some evidence of withdrawal from the conspiracy or the fulfillment or the defeating of the conspiracy's purpose, outside the limitations period, as a prerequisite for requiring the government to prove that the statute of limitations was satisfied. It argues that once it has shown that the defendants entered into a conspiracy, that conspiracy may be presumed to continue until the conspirators have abandoned it or until its objective is fulfilled or defeated.

To support its argument, the government relies primarily upon *United States v. Read,* 658 F.2d 1225 (7th Cir.1981), which in turn relied upon *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912) and *Pinkerton v. United States,* 328 U.S. 640, 66

S.Ct. 1180, 90 L.Ed. 1489 (1946). *Hyde* and *Read* both involved conspiracies which clearly had continued into the period of limitations; thus, the only question presented in those cases was whether a particular conspirator had withdrawn from the conspiracy and thus could not be held responsible for subsequent acts committed by the ongoing conspirators without his participation. *Read* simply held that while withdrawal relieves the withdrawing defendant of liability for the subsequent acts in furtherance of the conspiracy, it is not a defense to his liability for initially conspiring unlawfully unless he withdrew from the conspiracy before the limitations period. *Read,* 658 F.2d at 1233. *Read* further held that once the defendant raises the issue, the government must prove beyond a reasonable doubt that the defendant did not withdraw from the conspiracy before the limitations period. *Pinkerton v. United States,* also cited by the government, is of similar effect.

By contrast, in the present case the question is whether the conspiracy continued to exist in the five year period preceding the return of the indictment, not whether a particular defendant should be held responsible for acts in furtherance of a conspiracy that unquestionably continued into that period. The government's attempt to rely upon *Read* in effect bypasses the issue, squarely presented in this case, whether it is necessary to show in the first instance that the conspiracy continued into the period of limitations or rather whether the government may simply rely upon the fact that the conspiracy began and was not disavowed. The *dicta* the government has quoted from *Read* and *Pinkerton* do not answer this question.

The government's argument confuses the question of withdrawal, a defense not raised in the present case, with that of the satisfaction of the statute of limitations. Its position would require a defendant in any conspiracy prosecution to bring forward evidence of withdrawal, defeated purpose,

or accomplishment of purpose before the limitations period in order to avail himself of the defense that the prosecution is time-barred. To the extent that *Read* actually deals with the statute of limitations question, all it says is that withdrawal is not a defense to conspiracy unless combined with the assertion that the defendant withdrew more than five years before the indictment was brought. It does not, however, stand for the converse proposition—that the statute of limitations is not a defense absent combination with the defense of withdrawal.

■ Proof that a conspiracy continued into the period of limitations and that an overt act in furtherance of the conspiracy was performed within that period constitutes an element of the offense of conspiracy under 18 U.S.C. § 371. In *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the Supreme Court stated:

> . . . where substantiation of a conspiracy charge requires proof of an overt act [as is the case under 18 U.S.C. § 371], it must be shown both that the conspiracy still subsisted within the three years prior to the return of the indictment, and that at least one overt act in furtherance of the conspiratorial agreement was performed within that period.

*Id.* at 396–97, 77 S.Ct. at 970.[3] *Read* specifically refers to proof of membership in the conspiracy during the period of limitations as an "element" of the offense. *Read,* 658 F.2d at 1233; *see also id.* at 1232 ("to convict a defendant the prosecution must prove that the conspiracy existed and that each defendant was a member of the conspiracy at some point in the five years preceding the date of the indictment"). Thus, in order to convict a defendant under § 371 the government must prove prima facie that the statute of limitations was satisfied, a burden that will be met if the government proves prima facie that an overt act in furtherance of the conspiracy was committed within the limitations period. *See Grunewald;*

---

**3.** At the time *Grunewald* was decided, the statute of limitations applicable to the general conspiracy statute was three years rather than the present five.

*United States v. Hankin,* 607 F.2d 611, 612–13 (3d Cir.1979) ("[t]he Government has the burden of proof that the prosecution was instituted within the applicable statute of limitations"); *United States v. Wolf,* 405 F.Supp. 731, 733 (E.D.Mo.1975), *aff'd,* 535 F.2d 476 (8th Cir.1976), *cert. denied,* 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 287 (1976).[4]

Based upon the above discussion, defendants' tendered instruction was an accurate statement of the law. It would have informed the jury that proof of an overt act in furtherance of the conspiracy within the five years preceding the indictment was a necessary element of the government's burden. The charge we gave the jury in no way informed it that such a requirement existed. This alone warrants granting defendant's motion for new trial.[5]

## B

■ Defendants have also renewed their motion for judgment of acquittal under Fed.R.Crim.P. 29(c). In ruling on this motion, we view the evidence in the light most favorable to the government and inquire whether the jury reasonably could have found the defendants guilty beyond a reasonable doubt. *E.g., United States v. Beck,* 615 F.2d 441, 447–48 (7th Cir.1980). We must bear in mind, in deciding defendants' motion, that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences. *Id.* (citing *United States v. Blasco,* 581 F.2d 681, 684 (7th Cir.1978), *cert. denied,* 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978)).

Defendants argue that the proof that the burglary was committed in furtherance of the conspiracy charged in the indictment was fatally deficient. Because the burglary was the only overt act which the government proved, within five years of the date of the indictment, if it was not committed in furtherance of the conspiracy, count 1 is time-barred.

■ The indictment charged a conspiracy among Christopoulos, Coules, and Greichunos to enter the bank with intent to commit larceny. In order to determine whether the burglary was in furtherance of that conspiracy, we must first determine the scope of the conspiratorial agreement. *Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957) (scope of conspiratorial agreement determines whether a particular overt act may be relied upon as in furtherance of agreement). A conspiracy is comprised of various people knowingly joined together in pursuit of a common design or purpose. *United States v. Varelli,* 407 F.2d 735, 742 (7th Cir.1969). A single conspiracy exists where there is one overall agreement among the various parties to perform different functions in order to carry out a common objective. *Id.*

The scope of [each defendant's] agreement must be determined individually from what was proved as to him. If, in Judge Learned Hand's well-known phrase, in order for [one] to be held for joining others in a conspiracy, he "must in some sense promote their venture himself, make it his own," *United States v. Falcone,* 109 F.2d 579, 581 (2d Cir.1940), *aff'd,* 311 U.S. 205 [61 S.Ct. 204, 85 L.Ed. 128] (1940), it becomes essential to determine just what he is promoting and making "his own."

---

**4.** The defense of the statute of limitations is one which the defendant must affirmatively assert in order to trigger the government's burden of proving that the prosecution is not time-barred. *See United States v. Meeker,* 701 F.2d 685 (7th Cir.1983). Defendants raised the issue in their pretrial motion to dismiss the indictment.

**5.** In addition, the instruction as given was misleading and confusing and improperly imposed

a burden of proof on the defendants. It stated, in the first paragraph, that the government must prove beyond a reasonable doubt that the May 15 burglary was "*not* a result of the conspiracy" (emphasis added). Then in the last paragraph it stated that if the jury found "beyond a reasonable doubt that ... it [the conspiracy] terminated prior to May 13, 1977," it should acquit the defendants, thus improperly shifting the burden to the defendants.

*United States v. Borelli,* 336 F.2d 376, 385 (2d Cir.1964), quoted in *United States v. Varelli,* 407 F.2d 735, 743 (7th Cir.1969).

In the present case the evidence showed that Christopoulos proposed a scheme that would permit him to die "a hero." He recruited Coules to burglarize the bank and kill him (Christopoulos) in the process. Coules later recruited Greichunos into the plan. While the evidence is less than clear that Coules and Greichunos ever agreed to Christopoulos' overall scheme, there was evidence sufficient to persuade a reasonable trier of fact that they made Christopoulos' scheme "their own." [6]

Any claim that the burglary was not an act in furtherance of the three-party conspiracy must be based on one of two arguments. First, it could be argued that there was no evidence that the burglary was done by any of the conspirators. This contention is clearly without merit. If Christopoulos' testimony is believed, the *modus operandi* of the burglary conformed to the plan explained to Coules and Greichunos by Christopoulos.[7] That evidence would be sufficient to permit a reasonable trier of fact to find that the burglary was done in furtherance of the conspiracy, assuming that the original conspiracy continued through that date.

The second argument in support of the claim that the burglary was not in furtherance of the conspiracy is the argument forwarded by defendants here. Defendants assert that the burglary was not in furtherance of the original conspiracy, the object of which was, in defendants' words, "the death of Mr. Christopoulos [to] assure the financial future of his family and attest to his heroic devotion to duty." Memorandum of Law in Support of Motion in Arrest of Judgment at 3. They urge that Christopoulos, if his testimony is believed, had no interest in a scheme that involved simply the burglary of the bank; the essential element, as far as he was concerned, was his death. The others, in order to become part of the burglary scheme (at least initially), had to adopt Christopoulos' "higher goal" as well. However, it is argued, the burglary was not committed in furtherance of the Christopoulos proposal, for if Christopoulos is believed, he was not present at the time of the burglary, and indeed it happened entirely without his knowledge.[8] Thus, the argument goes, if the burglary was an act in furtherance of *any* conspiracy involving Coules and Greichunos, it had to be a second, separate conspiracy, one between those two only, formed some time after the initial agreement among Christopoulos, Coules, and Greichunos.

This argument is without merit. In determining whether a single conspiracy existed, "[o]ur concern is whether these defendants knowingly embraced a common criminal objective . . . ." *United States v. Ras,* 713 F.2d 311 at 314 (7th Cir.1983). The federally unlawful objective of Christopoulos' proposal was the burglary of the bank. The evidence, viewed in the light most favorable to the government, supports the conclusion that Greichunos and Coules adopted that objective. That they later may have gone ahead without Christopoulos, the initiator of the scheme, does not make the burglary an act in furtherance of a different conspiracy. The motion for judgment of acquittal is therefore denied.

---

**6.** It is clear that a conspiracy may be inferred from circumstantial evidence. *See United States v. Shelton,* 669 F.2d 446, 451 (7th Cir. 1982), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). That there was at least initial agreement by Coules and Greichunos to Christopoulos' overall scheme may be inferred from Coules' calling Christopoulos back after "thinking about" Christopoulos' plan and from Greichunos' continued participation after the initial meeting with Christopoulos.

**7.** Our ruling that there was insufficient evidence on count 2, which named only Greichunos as the burglar, does not foreclose the possibility that the May 15, 1977 burglary was an act in furtherance of the initial conspiracy.

**8.** The government based its theory of the case on Christopoulos' credibility, arguing repeatedly that while his story may have been difficult to believe, the circumstantial evidence demonstrated its truth. *See* Tr. 528–34, 534–37; 574–75.

### C

On June 21, 1982, the Assistant United States Attorney in charge of this case sent Greichunos' attorney a letter containing the following statement:

We recognize that both the government and the defendant have *a continuing obligation to disclose matters when discovered* which come within the scope of the rules of discovery, or, in the case of the government, the *Brady* doctrine.

*See* Defendant Greichunos' Brief in Reply to Government's Response to Post-Trial Motions, Ex. A (emphasis supplied). Despite this unambiguous undertaking, the government waited until the eve of trial to disclose evidence within the scope of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Other arguably exculpatory evidence was not disclosed until after trial had commenced. Defendants argue that this entitles them to a new trial.

As enumerated by defendant Greichunos, the undisclosed *Brady* material included the following items:

1. Reports of polygraph examinations which showed that Christopoulos had repeatedly evidenced deception in response to questions concerning the conspiracy and burglary. In one of these examinations, the examiner opined that Christopoulos' affirmative response to the question whether he had given the keys and combination to Coules was "particularly" indicative of deception. See Defendant's Exhibit ("D.Ex.") 2. In another examination, Christopoulos answered "yes" to the following questions, among others:

Did you plan that burglary of the First National Bank of Skokie?

Did you plan with John Coulos [sic] to steal money from that bank?

Did you take [Coules] on a "dry run" at that bank?

Did you give [Coules] those keys and combination to the bank safe?

Did you ask [Coules] to shoot you during the burglary of that bank?

The opinion of the examiner was that Christopoulos' answers to the relevant questions asked of him "were indicative of deception," i.e. that Christopoulos was lying when he implicated Coules in a conspiracy to burglarize the bank. See D.Ex. 3.

2. Reports of other polygraph examinations in which Christopoulos made apparently truthful statements that exculpated Coules and Greichunos. The FBI's report of a July 1980 polygraph examination performed upon Christopoulos, a retest performed after an earlier test in which he had indicated deception (*see* D.Ex. 3), states that after the examination was completed, Christopoulos was confronted with the fact that his responses showed deception. Christopoulos responded that "he had planned the burglary originally with one of his employees, Sherwin Robins, but he does not believe that Robins was involved . . . ." D.Ex. 6.

In addition, the report of the first polygraph test performed upon Christopoulos (on May 16, 1977) states that he told the examiner that he did not help or plan with anyone to steal the money from the First National Bank and that he did not know who had stolen it. The examiner's conclusion was that Christopoulos was "telling the truth." D.Ex. 1.

3. A statement supplied to the FBI by Sherwin Robins was not provided to defendants until after the start of the trial. In it, Robins stated that Christopoulos told him, after taking a lie detector test, that "[t]hey never did catch me, I really got away with it." D.Ex. 8.

4. Caroline Phillips' statement to the FBI also contradicted Christopoulos' version of the events in several respects. *See* D.Ex. 9. For example, Phillips stated that Christopoulos told her that the reason that he was not at the bank on the night of the burglary was that he feared that the burglars "would actually kill him, instead of merely hitting him on the head," as he had told her the plan contemplated. *Id.* at 24.

5. The government also failed to produce a laboratory report prepared by the Chicago Police Department which indicated that the alarm lock actually had been picked rather than opened with a key.

6. The government never produced two applications for life insurance made by Christopoulos after the date of the conspiracy. This was discovered only after one of the undisclosed applications was mistakenly sent into the jury room for the jury's consideration during its deliberations, instead of the application about which Christopoulos testified at trial. When the jury, showing the care and perspicacity which we have experienced with juries, inquired about the date on the application which it had before it, the multiple applications were disclosed. The defendants argue that the fact that Christopoulos made several applications for insurance casts doubt upon his story that the earlier purchase of insurance was connected with the scheme to burglarize the bank.

We are deeply troubled by the government's failure to produce this evidence. Even more troubling is the justification made at trial for the failure to produce the polygraph reports: "It's the Government's position that it is not *Brady*. Because it's not going to be admissible in a court of law." R. 10. *See also* R. 14 (THE COURT: Now, my understanding of the reason that you didn't disclose it is because in your judgment it was inadmissible. Is that right? [Government counsel:] That's right. THE COURT: That's the only reason? Right? [Government counsel:] Yes, Your Honor.).

■ The fact that exculpatory evidence may be inadmissible at trial is no justification for the government's failure to produce it to the defense. *See Sellers v. Estelle*, 651 F.2d 1074, 1077 n. 6 (5th Cir. 1981), *cert. denied*, 455 U.S. 927, 102 S.Ct. 1292, 71 L.Ed.2d 472 (1982). Even were that not the case, however, the government's judgment as to the admissibility of the evidence was incorrect. District courts in this circuit have the discretion to admit polygraph evidence in proper cases. *See, e.g., United States v. Black*, 684 F.2d 481, 484 (7th Cir.1982) (citing cases). In addition, apart from the polygraphers' opinions as to Christopoulos' credibility, the statements Christopoulos made during the course of certain of the polygraph tests were inconsistent with his testimony at trial and clearly were admissible under Fed.R. Evid. 613 as his prior inconsistent statements. The fact that the government erred in its determination of the admissibility of the polygraph reports and Christopoulos' statements recorded in those reports demonstrates the wisdom of the rule that potential inadmissibility of exculpatory evidence is no basis for the government's failure to disclose such evidence to a defendant; to permit the government to make such a determination in meeting its obligations under *Brady* would undoubtedly result in more errors of this type being committed.

■ Equally troubling is the fact that the government reneged on its June 21, 1982 commitment to the defendants. Under *United States v. Allain*, 671 F.2d 248, 255 (7th Cir.1982), we know that the *Brady* doctrine does not in itself require the government to make the disclosures compelled by that case and its progeny prior to trial. *See also United States v. McPartlin*, 595 F.2d 1321, 1346 (7th Cir.1979), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). The standard that is applied when the defendant claims that he did not receive *Brady* material in timely fashion is "whether the delay prevented defendant from receiving a fair trial." *Id.; see also United States v. Allain*, 671 F.2d at 255. We cannot help but believe, however, that where a defendant has relied on the government's specific undertaking to disclose exculpatory evidence "when discovered," disclosure on the eve of trial of information which the government has had in its possession for months is much more likely to prejudice the defendant than where he had no expectation of receiving the evidence at an earlier time. The government's promise of June 12 complied with the admonition of our former colleague, Judge John Powers Crowley:

Since preparation of the defense in a criminal case requires many complex decisions in strategy and preparation, particularly in preparation of cross-examination, it is by far the better practice to

require disclosure in advance of trial of those matters to which the Defendant is entitled as a matter of right.

*United States v. Dillard,* 419 F.Supp. 1000, 1001 (N.D.Ill.1976). Its failure to comply with that promise is at best grossly negligent and at worst reprehensible.

The government's breach of its agreement, however, does not in and of itself compel the granting of defendants' motion for new trial. The proper inquiry is still whether the defendant was prejudiced by the delay in receiving the exculpatory and potentially exculpatory evidence. *See United States v. Scanland,* 495 F.2d 1104, 1106–08 (5th Cir.1974). If the defendants were able to make effective use of the exculpatory material when tendered, then due process, which is the basis of *Brady,* is satisfied. *See United States v. Allain,* 671 F.2d at 255; *United States v. Ziperstein,* 601 F.2d 281, 291 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

Defendants' attorneys, particularly Greichunos' attorney, made good use of Christopoulos' inconsistent statements made during the polygraph examinations when he cross-examined Christopoulos at trial. In addition, we permitted Greichunos to call as a witness the polygraph examiner from one of the tests during which Christopoulos appeared to have practiced deception, in order to testify to his conclusions and opinion. And while the FBI agent to whom Christopoulos had stated that he planned the burglary with Sherwin Robins was unavailable to testify, the government agreed to stipulate to his testimony, and the stipulation was read to the jury.

In addition, defendants elicited from Caroline Phillips testimony that confirmed what she had told the FBI concerning Christopoulos' earlier versions of the conspiracy and the burglary. As for the police report concerning whether the alarm lock was picked rather than opened with a key,

defendants elicited from Arthur Paholke, the Chicago Police Department investigator who had examined the lock, testimony that confirmed the report. Thus, the report itself would have been cumulative and, as to it, the dictates of due process were not violated. *See United States v. Goldberg,* 582 F.2d 483, 490 (9th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979).

There remain the statement of Sherwin Robins and the additional insurance policies. Defendants were utterly unable to make use of the insurance policies, because they did not become aware of them until after the jury had begun its deliberations. As for Robins' statement, defendants received it from the government during trial. *See* R. 98–100. Although defendants' attorneys could have impeached Christopoulos with his statement about getting away with the burglary, they indicated that they were reluctant to lay the foundation for that impeachment without knowing whether Robins was available to be called as a witness should Christopoulos deny making the statement.[9] R. 99–100.

The government's callous disregard of its *Brady* obligations bolsters our conclusion that defendants are entitled to a new trial.

### D

In September 1980, Christopoulos was shown nine photographs from which he identified defendant Greichunos as the man whom he had known only as "John." Eight of the photographs consisted of two views: a full-face frontal view and a side or profile view of the subject. The ninth, which was the photo of Greichunos, was full-face view only. In addition, in that photograph Greichunos had a moustache and a light beard; Christopoulos testified at trial that at the time of the alleged conspiracy, the man named John had no facial hair. R. 232–33. Nor did Greichunos have any facial hair at

---

**9.** As it turned out, defendants' concern was not merely speculative. When confronted with another significant prior inconsistent statement—that he had told the FBI's polygraph examiner that he had planned the burglary with Robins—

Christopoulos denied having made the statement, R. 175, thus requiring defendants to introduce extrinsic evidence (by way of stipulation) that he in fact had made it.

the time of trial. The defendant argues that the photographic identification was unduly suggestive because of the difference between Greichunos' photograph and the others.

Christopoulos identified Greichunos at trial as well. R. 124–25. On redirect examination he testified without objection that in January 1980, before the allegedly suggestive photographic spread was shown to him, he described the man named John as being six feet, one inch in height, with good features, glasses, a straight nose, and about 190 to 215 pounds. R. 287. With the apparent exception of the description of Greichunos' nose, R. 292, this description fit Greichunos fairly closely. R. 294.

The Supreme Court has enunciated five factors to be considered in determining the reliability of an identification even when the procedures used were suggestive: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty exhibited by the witness at the identification, and the length of time between the crime and the identification. *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972). The question we must address is whether, under all the circumstances, there is a substantial likelihood of misidentification. *Id.* at 198, 93 S.Ct. at 381; *see also United States v. Cord,* 654 F.2d 490, 492–93 (7th Cir.1981); *United States v. Phillips,* 640 F.2d 87, 94 (7th Cir.1981), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981).

Christopoulos' identification of Greichunos' photograph strikes us as reliable, despite the suggestiveness in the procedure. Christopoulos met with Greichunos on three occasions during the course of the alleged conspiracy. One of these meetings was the dry run of early May 1977, a meeting which lasted for a fairly long period of time. Christopoulos testified on cross examination that he was certain that he had correctly identified the right man. R. 232. His January 1980 description of Greichunos was

substantially accurate. While it is true that over three years had passed between the time of the dry run and the September 1980 photo identification, we do not believe that that alone indicates that there was a "substantial likelihood" of misidentification.

██ Moreover, any error that might have occurred from the admission of testimony concerning the photo identification was cured or rendered harmless by Christopoulos' in-court identification of Greichunos. It is settled that an in-court identification need not be suppressed if the prosecution can show that it has a basis independent of any suggestive pretrial identification. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1976); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1966); *Bruce v. Duckworth,* 659 F.2d 776, 780 (7th Cir.1981), *cert. denied,* 455 U.S. 955, 102 S.Ct. 1464, 71 L.Ed.2d 673 (1982). Christopoulos' meetings with Greichunos in early 1977 and his January 1980 description of Greichunos gave sufficient reliability to the in-court identification. Were the motion for new trial based solely upon the admission of the photographic and in-court identifications it would be denied. Our observations in this regard are without prejudice to a pre-trial motion challenging the identifications should Greichunos make such a motion.

### E

██ While disclosure of the fact that a government witness is participating in the witness protection program is a matter that must be handled delicately, it generally is not sufficient alone to warrant a new trial unless the government has attempted to exploit the disclosure. *See United States v. Ciampaglia,* 628 F.2d 632, 639–40 (1st Cir. 1980), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980), *United States v. DiFrancesco,* 604 F.2d 769, 775 (2d Cir.1979), *rev'd on other grounds,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *United States v. Partin,* 552 F.2d 621, 644–45 (5th Cir.1977), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). Moreover, defendant Greichunos relied upon Christopou-

los' participation in the program in his closing argument. R. 548–49. In these circumstances, the disclosure did not taint the trial. The motion for new trial on these grounds would be denied.

### F

In summary, defendants' motion for a judgment of acquittal under Fed.R.Crim.P. 29(c) is denied because, construing the evidence most favorably to the government, the government proved prima facie that this prosecution was commenced within the statute of limitations. Defendants' motion for a new trial is granted because of our failure to give their requested statute of limitations instruction and the government's failure to discharge its obligations under *Brady v. Maryland.* Cause set for trial November 28, 1983 at 9:30 a.m.