842 F.2d 332
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Gilbert LEAL, Petitioner-Appellee,
v.
Terry MORRIS, Respondent-Appellant.
 No. 87-3014.
 United States Court of Appeals, Sixth Circuit.
 March 18, 1988.
 
 Before KEITH and ALAN E. NORRIS, Circuit Judges, and GIBBONS, District Judge.*
 PER CURIAM.
 
 
 1
 Terry Morris, Superintendent of the Southern Ohio Correctional Facility, appeals from an order of the district court, which granted a writ of habeas corpus to petitioner Gilbert Leal and ordered his release from custody unless a retrial commenced within sixty days of the order. The district court also ordered a stay of its judgment pending this appeal.
 
 
 2
 This case is before us a second time. On an earlier appeal by the state from a similar order, we remanded the case for reconsideration in light of United States v. Bagley, 473 U.S. 667 (1985), since the district court's decision was based upon the standards established by United States v. Agurs, 427 U.S. 97 (1976), for determining the materiality of evidence unconstitutionally suppressed by the prosecution.
 
 
 3
 Although we cannot condone failure by state prosecutors to disclose material evidence, our task in this appeal is to determine whether the evidence withheld in this case was material, under the standards of Bagley. Specifically, we are required to determine whether petitioner is entitled to a new trial, as the result of the state's suppression of (1) a statement given by Joe Costilla, a codefendant, to the police shortly after he was arrested, (2) a tape recording of a telephone conversation between petitioner and Olga Adams, a witness to the crimes, and (3) the results of two polygraph tests given to Costilla. The prosecution failed to disclose the items when petitioner's counsel requested discovery under Ohio R.Crim.P. 16.
 
 
 4
 The evidence supporting the jury verdict indicated that five masked and armed men entered the Broadside Bar shortly before 2:00 a.m. One of the men was armed with a shotgun and two others carried handguns. One grabbed a lady by the hair and held an ice pick to her neck. A shot was fired and the patrons were told to lie face down on the floor while the robbers stripped them of wallets and watches. One patron was shot and killed when he resisted one of the robbers.
 
 
 5
 Petitioner, his brother Antonio, and Costilla were each charged with aggravated robbery and aggravated murder. The cases were separated for trial in the Court of Common Pleas of Lucas County, Ohio. Costilla was scheduled to be tried first; however, he entered into a plea bargain whereby he would be permitted to plead guilty to a lesser charge of manslaughter if he successfully passed a lie detector test regarding other participants in the crimes, and then truthfully testified against them.
 
 
 6
 Costilla testified as a prosecution witness in the trial of petitioner, who was convicted on both counts, and also testified in two trials against Antonio Leal. The first trial resulted in a hung jury; Antonio was acquitted in the second. Adams testified as a state witness in all three trials.
 
 
 7
 Petitioner's convictions were affirmed by the Ohio Court of Appeals, and the Supreme Court of Ohio dismissed his appeal upon the ground that no substantial constitutional question existed.
 
 
 8
 While the appeal to the court of appeals was pending, petitioner filed a motion for new trial in the trial court, based upon defense counsel's discovery in the course of Antonio's first trial that the prosecution had not provided counsel with Costilla's statement to the police and the recording of the telephone conversation.[1] After an evidentiary hearing, the trial judge denied petitioner's motion, and he appealed.
 
 
 9
 After Antonio's acquittal in his second trial, petitioner filed a second motion for new trial asking the trial court to reconsider its denial of the first motion, and setting forth as an additional ground the fact that defense counsel had discovered, during the course of Antonio's second trial, a third suppressed item of evidence--the results of a polygraph test administered to Costilla.[2] Petitioner's counsel argued to the trial court that the state's evidence against both Leals was essentially the same, but that, because Antonio had been provided with full and fair disclosure, he was acquitted. That argument was rejected by the state trial and appellate courts, but was relied upon by the magistrate in these proceedings as a basis for recommending the issuance of the writ.
 
 
 10
 The state trial court held an evidentiary hearing on the second motion and considered not only the two suppressed items of evidence raised in the first motion, and the polygraph test results relied upon in his second motion, but also a second polygraph test given to Costilla, which was discovered during the hearing. The second motion for new trial was also denied and petitioner appealed. The court of appeals consolidated this appeal with the earlier one and affirmed the judgments. The Supreme Court of Ohio overruled petitioner's motion for leave to appeal.
 
 
 11
 Petitioner filed this petition for writ of habeas corpus alleging that, despite generalized pretrial requests for discovery, the prosecution failed to disclose the items of evidence mentioned above. The district court had before it transcripts of the record of the trial, the post-trial hearings and the appeals in petitioner's case, and the transcripts of the record of the state's evidence in both of Antonio's trials.
 
 
 12
 Since none of the exceptions set forth in 28 U.S.C. Sec. 2254(d)(1)-(7) apply to this case, both the district court and this court are required to presume that the merits of the factual findings of the Ohio courts are correct unless they are not fairly supported by the record. 28 U.S.C. Sec. 2254(d)(8). "[T]he factual findings arising out of the state courts' post-trial hearings are entitled to a presumption of correctness." Rushen v. Spain, 464 U.S. 114, 120 (1983). This presumption is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact. If a federal court concludes that the presumption of correctness does not control, it must provide a written explanation of the reasoning that led it to conclude that one or more of the first seven factors listed in 28 U.S.C. Sec. 2254 were present, or that the state's finding was not fairly supported by the record. Sumner v. Mata, 455 U.S. 591, 593 (1982) (per curiam); Kirby v. Dutton, 831 F.2d 1280, 1282 n. 3 (6th Cir.1987); Nichols v. Perini, 818 F.2d 554, 557 (6th Cir.1987).
 
 
 13
 However, "the appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive.... [T]he Court has yet to arrive at 'a rule or principle that will unerringly distinguish a factual finding from a legal conclusion.' " Miller v. Fenton, 474 U.S. 104, 113 (1985) (citations omitted). "Perhaps much of the difficulty in this area stems from the practical truth that the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis." Id. at 113-14.
 
 
 14
 We find no authority directly in point in this court with respect to whether the presumption of correctness applies to the determination of the materiality, under Brady v. Maryland, 373 U.S. 83 (1963), of evidence improperly withheld by the prosecution. However, the weight of authority in other courts of appeals indicates that such determinations are mixed questions of law and fact and therefore are not entitled to the presumption of correctness. Carter v. Rafferty, 826 F.2d 1299, 1306 (3d Cir.1987); Bowen v. Maynard, 799 F.2d 593, 610 (10th Cir.), cert. denied, 107 S.Ct. 458 (1986); Ruiz v. Cady, 635 F.2d 584, 589 (7th Cir.1980); Davis v. Heyd, 479 F.2d 446, 451 (5th Cir.1973). This court has recognized that the presumption of correctness applies only to state findings of "basic, primary, or historical fact," Townsend v. Sain, 372 U.S. 293, 309 n. 6 (1963), and does not apply to mixed questions of law and fact. Accordingly, this court has held the presumption inapplicable in analogous habeas corpus cases. Blackburn v. Foltz, 828 F.2d 1177, 1181 (6th Cir.1987) (ineffective assistance of counsel); Caudill v. Jago, 747 F.2d 1046, 1050 (6th Cir.1984) (plea of guilty); Bailey v. Hamby, 744 F.2d 26 (6th Cir.1984) (request for counsel); Haggins v. Warden, Fort Pillow State Farm, 715 F.2d 1050, 1055 (6th Cir.1983) (admission of hearsay), cert. denied, 464 U.S. 1071 (1984).
 
 
 15
 Because we believe that the majority rule is correct and consistent with our rulings just cited, we shall consider this case as one where we must exercise independent judgment.
 
 
 16
 Brady v. Maryland requires disclosure only of evidence that is both favorable to the accused and "material either to guilt or to punishment." 373 U.S. at 87. The state's failure to assist a defendant by disclosing evidence which might be helpful in cross-examination is a constitutional error only if it is material in the sense that it is reasonably probable that the outcome of the trial would have been different had the evidence been disclosed. United States v. Bagley, 473 U.S. at 682. In determining the materiality of each of the suppressed items of evidence, we may "consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case." Id. at 683. Further, we must assess:
 
 
 17
 "the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."
 
 
 18
 Id.
 
 
 19
 On remand, the magistrate again recommended issuance of the writ. The district court, adopting the magistrate's application of Bagley, and relying upon a "paradigm" constructed by the magistrate, concluded that, "had the evidence been disclosed, it would to a reasonable degree of probability have led to a different result at trial."
 
 
 20
 The paradigm, which compared the evidence and results in the trials of petitioner and Antonio, was the major factor influencing the court's decision. The district court first found that the state's evidence at Antonio's first trial was the same as the state's evidence at petitioner's trial, except that Costilla's statement and the taped conversation were admitted as evidence in Antonio's trial. The result was a hung jury. In Antonio's second trial, the result of the first polygraph test was used to impeach Costilla. The result was acquittal. Therefore, the district court reasoned that a reasonable probability existed that the outcome of petitioner's trial might have been different if Costilla's statement, Adams' taped conversation, and the results of the two polygraph tests had been disclosed to petitioner's counsel.
 
 
 21
 No precedent was cited for the use of the paradigm. The Ohio courts rejected the paradigm portion of petitioner's argument without comment.
 
 
 22
 Although actions involving identical parties and issues may affect subsequent cases by way of res judicata, claim preclusion, or issue preclusion, to our knowledge it has never been seriously suggested that courts should be compelled, in the consideration of a criminal case, to examine the records of the separate trials of the accused's coconspirators. In effect, the approach attempts to do indirectly what a court would never do directly--inquire into the jury's deliberations to determine the effect that each item of evidence had upon its verdict. The approach would impose upon courts an impractical, if not impossible, task of reviewing and attempting to compare the testimony in the records of several different criminal trials.
 
 
 23
 In addition, the state's evidence, apart from the three questioned items, was not identical in the trials of the two brothers. Only one witness identified Antonio as a participant, whereas three witnesses positively identified petitioner as one of the robbers. Antonio also produced alibi evidence that he was in Chicago at the time of the crime. Even a cursory examination of the records of Antonio's two trials reveals the impossibility of attempting to compare them with petitioner's trial.
 
 
 24
 The most significant difference is that petitioner's trial judge clearly and correctly would have refused to admit the polygraph evidence. Thus, the paradigm itself is destroyed because it has no value under any theoretical structure apart from the results in Antonio's second trial.
 
 
 25
 Although the district court's reliance upon the paradigm constitutes a sufficient basis for reversal, we will address the three evidentiary issues which grounded the petition for habeas corpus relief.
 
 
 26
 I. Costilla's Prior Inconsistent Statement (The "Bogus
 
 Alibi")
 
 27
 Costilla was arrested the morning after the robbery and murder. At that time, he told the police that he had been with a female companion around midnight, that he was alone with her all night, and that, on the following morning, he got up at 11:00 a.m. and went home.
 
 
 28
 The state courts considered Costilla's statement under the third Agurs standard of materiality, which then was applicable to "situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." United States v. Agurs, 427 U.S. at 110. In such situations, the Court stated:
 
 
 29
 "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."
 
 
 30
 Id. at 112.
 
 
 31
 The state trial and appellate courts found that the statement would not have created a reasonable doubt that did not otherwise exist. However, the district court felt that petitioner's conviction rested almost directly on Costilla's testimony. Because the "credibility of Costilla, the prosecution's 'chief witness,' was determinative of petitioner's guilt," use of the inconsistent statement would have created a reasonable doubt.
 
 
 32
 The state argues that although Costilla's statement would have been relevant in petitioner's trial to impeach Costilla, its effectiveness for that purpose would have been limited since he admitted at trial that he was testifying only to save his own skin and would not otherwise have testified; that he had been convicted of a felony; that he had participated in the aggravated robbery and murder; that he was a drug user; and that he had an adulterous relationship with petitioner's common-law wife.
 
 
 33
 Petitioner contends that it is difficult to conceive of a more powerful impeachment device than a prior statement in which the chief prosecution witness denies that he was present at the scene of the crime.
 
 
 34
 The question, then, for our decision is whether a reasonable probability exists that the jury would have reached a different conclusion if it had known that Costilla lied to the police when he was apprehended hours after the robbery and murder. Or, in the language of Bagley, is there a reasonable probability that the results of the proceedings would have been different?
 
 
 35
 At trial, petitioner was identified as having participated in the crime by Costilla and three other witnesses who were present at the scene. John Aguirre, owner of the Broadside Bar, testified that petitioner had been present in the bar earlier and, although he was ordered to the floor and could not see petitioner, he recognized his voice. Olga Adams, a girl friend of Aguirre, testified that she knew petitioner previously and identified him by his speech and exposed facial features. Mary Ann Marquez, Adams' sister, also testified to the same effect. When petitioner was arrested, a .38 caliber handgun was discovered in his car and, upon a search of his home, .38 caliber shells and a barrel and stock of a sawed-off shotgun were found. Ballistic tests indicated that the handgun was not the murder weapon. However, Costilla positively identified the barrel, by its distinctive markings, as having come from the shotgun used in the robbery.
 
 
 36
 Petitioner testified in his own defense. Both he and his wife testified that he had been present in the Broadside Bar earlier on the night of the robbery, but claimed to have been home alone when the robbery occurred. His wife's testimony was impeached by a prior statement she had given to police, in which she said that petitioner had been home the entire evening. Petitioner further testified that the witnesses against him lied, and that the apprehending officer lied when he testified that he witnessed petitioner attempting to conceal a handgun when the officer stopped his car. In addition, a defense witness stated that he had known petitioner well since he was a boy, that he did not recognize petitioner as being present at the robbery, and that petitioner was not, as Marquez had testified, the first robber to come through the door.
 
 
 37
 The inconsistencies in the testimony are those which might be expected where the criminal's plan was designed to make identification impossible. In such circumstances, identification testimony always requires careful deliberation by both jury and judge. Nevertheless, the evidence overwhelmingly indicates that petitioner was guilty. The question then becomes whether a reasonable probability exists that Costilla's statement, in light of the witnesses' limited opportunities for viewing and hearing the robbers, would have changed the outcome.
 
 
 38
 Costilla admitted that his participation in the crimes was related to his need for money to purchase drugs and, further, that he would not have testified against petitioner except for the plea bargain. The judge and jury observed his demeanor. The evidence must have conveyed to the jury, as it did to the trial judge, that Costilla's character was that of a person who would lie if he could get away with it, whether the lie was told to protect himself or to convict another. Further, the jury might have regarded his adulterous relationship with petitioner's wife as a motive to remove petitioner as a competitor for her affections. It is doubtful that rational jurors would be either surprised or affected by the additional knowledge that such a witness had lied to police. Thus, we are unable to accept petitioner's argument that the statement is such a powerful impeachment device.
 
 
 39
 Since Costilla had plea bargained for a reduced sentence and knew that he must truthfully testify in order to keep his part of the plea bargain, it is probable that he would have admitted making earlier statements to the police. A requirement that states must grant new trials under these circumstances might invite, in some cases, a deliberate omission of cross-examination as to prior statements to police in the hope of preserving a possible post-conviction remedy.
 
 
 40
 Accordingly, we hold that the district court's findings with respect to the materiality of Costilla's bogus alibi are erroneous. We are satisfied that no reasonable probability exists that, had the statement been disclosed to the defense, the results of the proceedings would have been different. The failure to disclose the statement does not undermine our confidence in the outcome of the trial.
 
 II. The Taped Conversation
 
 41
 According to testimony at the hearings on the two motions for a new trial, after his arrest and confinement in jail, petitioner telephoned Olga Adams and other witnesses to the crime. After Adams received his first call, the police provided her with equipment with which she taped a portion of his second call.
 
 
 42
 The trial judge concluded that the tape recording was not exculpatory but, instead, was damaging to petitioner's cause due to its threatening tenor. He deemed it significant that Adams did not change her testimony at trial despite the ominous undertones of the taped conversation. He also questioned whether defense counsel exercised due diligence in uncovering the existence of the tape since his client had initiated the calls and counsel was aware of the calls prior to trial.
 
 
 43
 Having reviewed the tape recordings, we are unable to say that the trial judge mischaracterized them. Since the tape contains no express threats, whether the taped conversation was threatening or precatory is a question of fact to be determined from the entire text and context of the conversation. The trial judge observed the testimony of both Adams and petitioner and listened to the tape. He found that the tape was threatening. We accept that finding as being both supported by the record and, in our view, an important underlying fact in the mixed question of law and fact to be decided. Similarly, deference is due the state appellate court's finding that the statement would have harmed petitioner as much as it would have helped him.
 
 
 44
 Petitioner's protestations of innocence, made in the course of the recorded conversation, were merely self-serving, prior consistent statements. He cites no authority or reasons why any court should permit an accused to telephone persons he believes were at the scene of the crime and manufacture evidence by repeated protestations of innocence. In Ohio, and elsewhere, such prior consistent statements are uniformly inadmissible except where they are truly relevant to the rehabilitation of a witness. In Ohio, a party may not introduce his own statement; it must be offered by the opposing party. See Ohio R.Evid. 801(D)(2)(a); State v. Gatewood, 15 Ohio App.3d 14, 16, 472 N.E.2d 63, 65 (1984).
 
 
 45
 The magistrate found that the tape shows that Adams was less than certain in her identification of petitioner. The tape indeed indicates such uncertainty, but only if no consideration is given to the circumstances of the call; the tape's threatening tone as found by the trial judge; Adams' obvious attempts to trap petitioner while avoiding antagonizing him; Adams' failure to be reassured by petitioner's comforting words that she had no reason to fear that she or her child would be killed if she testified; and petitioner's stressing that, if she did testify, he would hate her for the rest of her life.
 
 
 46
 Petitioner also argues that the tape shows a strong motive for Adams, her boyfriend, and her sisters, to lie. Our reading of her statement does not indicate such a motive and neither the state courts nor the district court found such a motive.
 
 
 47
 Although it might be argued that the conversation was relevant for impeachment purposes, it could not have been used without laying a proper foundation. It would be impossible to use any part of the taped conversation for impeachment without making the jury aware of the inadmissible, self-manufactured, exculpatory statements, since the conversation cannot be explained apart from its context. In addition, the court would have had to determine whether the probative value of the conversation was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. Ohio R.Evid. 403(A).
 
 
 48
 Accordingly, the district court's ruling on this item of evidence was erroneous; no reasonable probability exists that, had the statement been disclosed to the defense, the results of the proceeding would have been different. The failure to disclose the statement does not undermine our confidence in the outcome of the trial.
 
 III. The Polygraph Tests
 
 49
 The magistrate's treatment of the polygraph tests, which was adopted by the district court, appears to disregard Ohio law and the trial judge's declaration that he would not have admitted the polygraph tests had they been offered in evidence. Yet, we are asked to accept the premise that, since Antonio Leal's counsel persuaded his trial judge to admit the results of the test, petitioner's counsel also might have been equally persuasive.
 
 
 50
 The district court and petitioner cite only United States v. Greichunos, 572 F.Supp. 220 (N.D.Ill.1983), which held that the inadmissibility of exculpatory evidence does not justify the prosecution's failure to produce it. However, that decision points out that, in the Seventh Circuit, polygraph evidence is admissible in the discretion of the court. Id. at 230.
 
 
 51
 In Ohio, polygraph evidence was not then, and is not now, admissible except under specified conditions which require the consent of both the defendant and the state. Even then, admissibility is subject to the discretion of the trial judge, who may refuse to accept such evidence if not convinced that the examiner was qualified or that the test was conducted under proper conditions. State v. Souel, 53 Ohio St.2d 123, 132, 372 N.E.2d 1318, 1323 (1978); State v. Levert, 58 Ohio St.2d 213, 215, 389 N.E.2d 848, 850 (1979); State v. Woodruff, 10 Ohio App.3d 326, 327, 462 N.E.2d 457, 459 (1983). Furthermore, the state may, by a motion in limine, obtain a pretrial order prohibiting references to the results of polygraph tests. State v. Whitmeyer, 20 Ohio App.3d 279, 279-80, 485 N.E.2d 1055, 1056 (1984).
 
 
 52
 Both the prosecutor and Costilla's counsel agreed to a plea bargain that required Costilla to pass a polygraph test with respect to naming the participants in the crimes. No judicial action was involved in the plea bargain. The tests were performed in order to permit the prosecutor to exercise the discretion committed to his office, and not for the purpose of introducing the test results as evidence. The trial judge found that the prosecution, in good faith, believed that the test results were not discoverable.
 
 
 53
 Although polygraph test results may be discoverable for reasons other than admitting them into evidence, petitioner's concern has always been to use the test results to impeach Costilla. Except where Souel requirements are met, Ohio law prohibits use of polygraph test results for purposes of corroboration or impeachment. See Levert, 58 Ohio St.2d at 215, 389 N.E.2d at 850.
 
 
 54
 Because the factual record in this case is complete and our determination does not call for the further resolution of any factual issues, remand is unnecessary. United States v. Nichols, 818 F.2d at 558. The order of the district court, dated December 2, 1986, is reversed, and the writ is denied.
 
 
 
 *
 Honorable Julia S. Gibbons, United States District Judge for the Western District of Tennessee, sitting by designation
 
 
 [1]
 In Antonio's first trial, his counsel impeached Costilla's testimony by introducing a statement made to police after his arrest. The district court and the parties have characterized this statement as the "bogus alibi" since, in it, Costilla told police that he was elsewhere at the time the crimes were committed, as opposed to his later testimony at trial that he participated in the crimes. In addition, Antonio's counsel impeached Adams' testimony by use of the tape recording of her conversation with petitioner
 
 
 [2]
 The test results, which had not been made available to Antonio in his first trial, were used in his second trial to impeach Costilla. The police officer who administered the test indicated that it revealed strong responses by Costilla when he denied that he shot anyone while he was in the bar, denied that he had fgned his gun that night, and denied that he had lied during the test. However, Costilla showed only slight responses to two questions asking whether he was with all of the people that he said he was with, and whether he was telling the truth about "who was with you during the robbery?". When the officer was asked if he could say to any degree of certainty whether Costilla was showing deception on those two questions, he replied: "Taking those two questions as a small part of the examination, I would be hesitant to say there was deception there." He also testified that Costilla did not show any signs of deception that indicated, as a reasonable scientific certainty, that petitioner was not involved with Costilla in the crimes. Nevertheless, the officer concluded that, based upon the examination as a whole, deception was present